## UNITED STATES DISTRICT COURT
## DISTRICT OF MINNESOTA

| | |
|---|---|
| IV Media, LLC, a Minnesota limited liability company, and IV Media Properties, LLC, a Minnesota limited liability company, | Court File No. 25-cv-1358 |
| Plaintiffs, | **COMPLAINT**<br>**(JURY TRIAL DEMANDED)** |
| v. | |
| Pontus IMB Portfolio, LLC, a Delaware limited liability company, and Pontus Net Lease Advisors, LLC, a Delaware limited liability company, | |
| Defendants. | |

IV Media, LLC ("IV Media"), and IV Media Properties, LLC ("IV Properties," and together with IV Media, "Plaintiffs"), by and for their complaint against Pontus IMB Portfolio, LLC ("Pontus IMB") and Pontus Net Lease Advisors, LLC ("Pontus Net Lease," and together with Pontus IMB, "Defendants"), state and allege as follows:

### INTRODUCTION

1.  Plaintiffs are the successors-in-interest to the Chapter 11 Liquidating Bankruptcy Trustee in *In re iMedia Brands, Inc., et al.*, Court File Number 1:23-bk-10852-KBO ("the Bankruptcy"), pending in the United States Bankruptcy Court for the District of Delaware ("the Bankruptcy Court"), where it is assigned to Judge Karen B.

Owens.[1]

2.     Plaintiffs have purchased from the Bankruptcy estate all of the relevant Bankruptcy

estates' federal and state avoidance claims under 11 U.S.C. §§ 544, 547, 548, 549,

and 550 to avoid the wrongful transfers and obligations alleged herein and any

similar state law claims, and/or are entitled to refunds of overpayments.

3.     This is an action to avoid certain obligations and transfers that were part of a sale-

leaseback transaction in which Defendants strategically caused immense financial

distress to insolvent companies, and then exploited that distress to extract far more

value than Defendants provided, including obtaining a multi-million dollar building

in Eden Prairie, Minnesota, for which Defendants paid nothing.

4.     First, Defendants forced bankruptcy debtor EP Properties, LLC ("EP Properties")

(described in more detail below) to transfer to Defendants two buildings in

Minnesota for the price of one — thereby taking a multi-million dollar property

without providing anything in return, and adversely affecting not only EP

Properties, but also its affiliates, VVI Fulfillment Center, Inc. ("VVI") (described

in more detail below), and iMedia Brands, Inc. ("iMedia Brands") (described in

more detail below).

---

[1]     The debtors in these Chapter 11 cases, along with the last four digits of each debtor's federal tax identification number are: ValueVision Media Acquisitions, Inc. (8670); Legacy IMBDS, Inc., formerly known as iMedia Brands, Inc. (3770); ValueVision Interactive, Inc. (8730); Portal Acquisition Company (3403); VVI Fulfillment Center, Inc. (5552); ValueVision Retail Inc. (2155); JWH Acquisition Company (3109); PW Acquisition Company, LLC (0154); EP Properties, LLC (3951); FL Acquisition Company (3026); Norwell Television, LLC (6011); and 867 Grand Avenue, LLC (2642).

5.     Second, Defendants subjected bankruptcy debtor iMedia Brands to onerous lease terms for its continued right and ability to use its properties — including the building that Defendants had wrongly taken for free and had no right to own, lease, or monetize in the first place.

6.     Plaintiffs bring this action pursuant to 11 U.S.C. §§ 548(a)(1)(B), 550(a), and 544, Minn. Stat. §§ 513.44(a)(2) and 513.45(a), and other applicable state and federal law.

7.     Plaintiffs seek entry of judgment:

     i.     voiding the Purchase and Sale Agreement and Joint Escrow Instructions (Multi-State) Agreement dated December 20, 2022, between Defendant Pontus Net Lease and EP Properties and VVI, subsequently assigned by Pontus Net Lease to Defendant Pontus IMB (the "Sale-Leaseback Agreement");

     ii.     restoring title to the real estate and personal property at issue in the Sale-Leaseback Agreement, substituting Plaintiff IV Media for EP Properties and VVI pursuant to the Bankruptcy Court's orders, and thus awarding title solely to Plaintiff IV Media or, in the alternative, awarding Plaintiff IV Media a monetary judgment for the value thereof;

     iii.     voiding the Master Lease Agreement dated April 10, 2023, between Pontus IMB and iMedia Brands (the "Master Lease"), to which Master Lease Plaintiff IV Properties was substituted pursuant to the

Bankruptcy Court's orders;

iv.      awarding Plaintiff IV Properties — as successor-in-interest to iMedia Brands pursuant to the Bankruptcy Court's orders — a judgment against Pontus IMB for the amount of all rent and security deposits paid, and all maintenance and repair obligations incurred that do not accrue to permanent value of the Kentucky Properties and the Minnesota Properties, from April 10, 2023, through the date of judgment;

v.      voiding the iMedia Post-Closing Obligations Agreement dated April 10, 2023, between Pontus IMB and EP Properties, VVI, and iMedia Brands; and

vi.      awarding Plaintiff IV Media — as successor-in-interest to EP Properties and VVI pursuant to the Bankruptcy Court's orders — or, alternatively, Plaintiff IV Properties — as successor-in-interest to iMedia Brands pursuant to the Bankruptcy Court's orders — a monetary judgment against Pontus IMB for the principal amount of escrowed "Repair Costs reserve" funds of $958,500, plus interest.

vii.      In the alternative, entering a declaratory judgment under 28 U.S.C. § 2201(a) that the provision in Article 26 of the Master Lease terminating the iMedia Group's right to subdivide the 6700 Shady Oak Road, Eden Prairie, Minnesota, lot to separate the land and the building located at 6690 Shady Oak Road, Eden Prairie, Minnesota

(the "6690 Property") from the land and the building located at 6740 Shady Oak Road, Eden Prairie, Minnesota, solely as a result of the iMedia Group's bankruptcy filing is unenforceable under 11 U.S.C. § 365(e)(1)(B) and that IV Media and IV Properties — as successors-in-interest to the iMedia Group's rights under the Master Lease — have the right to subdivide the 6700 Shady Oak Road, Eden Prairie, Minnesota, lot as otherwise provided for in Article 26 of the Master Lease.

## PARTIES

8.   Plaintiff IV Media is a Michigan limited liability company and has its principal place of business in Hennepin County, Minnesota.

9.   Plaintiff IV Properties is a Minnesota limited liability company and has its principal place of business in Hennepin County, Minnesota.

10.  Defendant Pontus IMB is a Delaware limited liability company.

11.  Upon information and belief, Pontus IMB's principal place of business is in California.

12.  Pontus IMB is an affiliate of Pontus Capital LLC ("Pontus Capital"), a Nevada limited liability company with a principal place of business in California.

13.  Defendant Pontus Net Lease is a Delaware limited liability company.

14.  Upon information and belief, Pontus Net Lease's principal place of business is in California.

15.     At all relevant times, Defendant Pontus Net Lease was an affiliate of Pontus Capital LLC, its managed funds, and its affiliates.

## JURISDICTION AND VENUE

16.     This Court has federal-question jurisdiction under 28 U.S.C. § 1331 because the causes of action arise under federal statutes, 11 U.S.C. §§ 548 and 550.

17.     This Court additionally has supplemental jurisdiction under 28 U.S.C. § 1367 over all claims that are so related to the federal-question claims that they form part of the same case or controversy under Article III of the United States Constitution.

18.     This Court has personal jurisdiction over Pontus IMB because it owns real property in Hennepin County, Minnesota, which is at issue in this action, such that the exercise of personal jurisdiction would not offend traditional notions of fair play and substantial justice.

19.     This Court has personal jurisdiction over Pontus Net Lease because it entered into agreements relating to the real property in Hennepin County, Minnesota, now owned by Defendant Pontus IMB, and engaged in the acts complained of herein with respect to the Hennepin County, Minnesota, real property.

20.     Venue is proper in this Court under 28 U.S.C. § 1391(b)(2) because the causes of action, or substantial parts thereof, arose in Hennepin County, Minnesota, and the real property that is at issue in this action is located in Hennepin County, Minnesota.

## FACTUAL ALLEGATIONS

21.     In 2022, EP Properties, a now administratively-dissolved Minnesota limited liability

company, owned two buildings on one lot in Eden Prairie, Minnesota, with street addresses of 6690 Shady Oak Road and 6740 Shady Oak Road, Eden Prairie, Minnesota 55343.

22. For purposes of the Hennepin County Recorder and the Hennepin County Assessor, the lot comprising 6690 Shady Oak Road and 6740 Shady Oak Road is 6700 Shady Oak Road, Eden Prairie, Minnesota 55343.

23. A "Limited Property Condition Assessment Report" dated August 20, 2021, contains the following overview:



24. Also in 2022, VVI, a now administratively-dissolved Minnesota limited liability company, owned two buildings with street addresses of 4811 and 4813 Nashville Road, in Bowling Green, Kentucky 42101 (jointly "the Kentucky Properties").

25.  EP Properties and VVI were at all relevant times subsidiaries of iMedia Brands, a now administratively-dissolved Minnesota corporation.

26.  The building located at 6740 Shady Oak Road was used as the operational headquarters of iMedia and affiliated entities (jointly "the iMedia Group") and is referred to herein as the "the Headquarters Building."

27.  The 6690 Property and the Headquarters Building are jointly referred to herein as the "Minnesota Properties."

28.  The Kentucky Properties were used as the principal distribution facilities for an interactive media enterprise that capitalized on the convergence of entertainment, ecommerce, and advertising, all under the corporate umbrella of the iMedia Group.

29.  In August 2021, the iMedia Group had signed an asset-backed loan agreement ("ABL Agreement") with Siena Lending Group, LLC ("Siena") that provided an $80 million revolver facility with a term of 26 months.

30.  The iMedia Group saw revenues decline over 2021-2023 as inflationary pressures contributed to a reduction in at-home discretionary spending by consumers, resulting in significant financial losses.  From January 1, 2022, through September 30, 2022, the iMedia Group suffered an operating loss of $41.4 million in the business segment that typically accounted for the iMedia Group's largest revenue stream.

31.  By the fall of 2022, the iMedia Group's relationship with Siena had begun to deteriorate and it expected to incur debts beyond its ability to pay when they became due.

32.   Between August 2021 and the fall of 2022, Siena charged the iMedia Group $3 million in fees over and above the amounts otherwise provided for under the ABL Agreement, in exchange for which Siena provided seven amendments to Siena's senior debt-leverage ratio covenant, and increased the interest rate from 5% to 10%.

33.   By the fall of 2022, the iMedia Group owed more than $63.5 million under the ABL Agreement, and had not complied with the net senior-leverage ratio and the minimum-liquidity covenant of that agreement.

34.   In October 2022, the iMedia Group's financial situation became even more dire when Siena refused to waive the iMedia Group's covenant defaults before the filing of iMedia Group's 10-Q, and reduced iMedia Group's liquidity by $10 million.

35.   By October 29, 2022, the iMedia Group could not reasonably expect to pay debts as they became due and became insolvent because of a number of factors, including declining sales, falling inventory levels, tightening of trade terms, and the ongoing reduction in borrowing-base availability.

36.   In a December 13, 2022 10-Q with the United States Securities and Exchange Commission, the iMedia Group acknowledged that as of October 29, 2022, there was substantial doubt about its ability to continue as a going concern for the next 12 months.

37.   The iMedia Group did not file another 10-Q during the rest of 2022 or in 2023.

38.   To address its liquidity issues and issues with Siena, the iMedia Group sought to refinance the Siena debt with PNC Bank ("PNC").

39.   To generate cash and facilitate the refinancing with PNC, the iMedia Group began

marketing some of its real estate, including the Kentucky Properties and the Headquarters Building.

40.    In November 2022, iMedia agreed to and accepted a Letter of Intent ("LOI") from Defendant Pontus Net Lease, setting forth the proposed terms of a sale and leaseback to the iMedia Group of the Kentucky Properties and the Headquarters Building, but not the 6690 Property.

41.    A true and correct copy of the LOI is attached hereto as **Exhibit 1**.

42.    A "sale-leaseback" transaction is a tool to raise capital where the owner of commercial real estate sells the real estate to a third party, then leases it back, usually to generate cash for a business from the equity value in the real estate.

43.    The sale-leaseback seller gets an immediate cash infusion and retains use of the real property, while the sale-leaseback buyer gets a stream of rental income which repays the purchase price with a return on investment.

44.    iMedia agreed to and accepted the LOI after a robust marketing process with multiple potential counterparties.

45.    iMedia selected the LOI over other potential transactions presented to them in the open market.

46.    The LOI provided that the iMedia Group would sell the Kentucky Properties and the Headquarters Building to Pontus Net Lease for a purchase price of $48 million, and that Pontus Net Lease would then lease those three properties back under "absolute triple net master leases with the ability to sublease each property to each of the proposed single-purpose entity tenants operating at each of the Properties."

(Exhibit 1 at 1.)

47.   A triple-net lease means that the tenant pays (a) the base rent, (b) property taxes, insurance, and maintenance costs, and (c) utilities, effectively shifting property operating expenses from the landlord to the tenant.

48.   EP Properties would retain ownership of the 6690 Property, which was excluded from the LOI.

49.   The LOI provides for a lease term of 21 years, annual base rent of $4,320,000, a cash security deposit or letter of credit equal to six months of Base Rent, and rent escalations of 2.5% per year.

50.   In exchange, the iMedia Group granted Pontus Net Lease a 60-day exclusivity period following the execution of the LOI.

51.   In the LOI, Pontus Net Lease further represented that it would complete its review of due diligence materials by the later of: (a) 10 business days following the delivery to Pontus Net Lease of the environmental report, zoning report, property condition report, title commitment, and survey or (b) 40 days after the mutual execution of the Purchase Agreement ("the Due Diligence Period").

52.   Pontus Net Lease also agreed that closing would occur 15 business days following expiration of the Due Diligence Period.

53.   To sell the Headquarters Building separate from the 6690 Property, the iMedia Group began subdivision proceedings for the 6700 Shady Oak Road lot during the negotiations of the LOI and purchase agreement.

54.   The iMedia Group hired an engineering firm to complete a survey and proposed site

plan for the lot split.

55. The iMedia Group had extensive discussions with the City of Eden Prairie about the lot split.

56. Pontus Net Lease, EP Properties, and VVI executed the Sale-Leaseback Agreement on December 20, 2022, to govern the sale of the Headquarters Building and the Kentucky Properties to Pontus Net Lease for $48 million.

57. A true and correct copy of the Sale-Leaseback Agreement is attached hereto as **Exhibit 2**.

58. The Sale-Leaseback Agreement provided that the parties would negotiate a master lease agreement under which Pontus Net Lease would lease the three buildings back to iMedia Brands on terms consistent with the LOI. (Sale-Leaseback Agreement § 1.03 and Schedule A, *Tenant*.)

59. Also on December 20, 2022, the iMedia Group entered a forbearance agreement with Siena, in which Siena agreed to forebear from exercising remedies under the ABL Agreement until January 31, 2023 (the "January 31 Siena Forbearance Period").

60. Consistent with the LOI, the Sale-Leaseback Agreement excluded the 6690 Property from the purchase and associated purchase price.

61. The Sale-Leaseback Agreement's recitals and section 1.06 of the Sale-Leaseback Agreement set forth the iMedia Group's intent to legally divide the 6690 Property (referred to in the Sale-Leaseback Agreement as the "Shady Oak Property") from the Headquarters Building, and sell only the Headquarters Building to Pontus Net

Lease.

62. Section 1.06 of the Sale-Leaseback Agreement further provided that, if the subdivision could not be completed by the closing date of the sale, the iMedia Group would be permitted to repurchase the 6690 Property for $100, free and clear of any liens or mortgages created by Pontus Net Lease.

63. The Sale-Leaseback Agreement also stated that the iMedia Group would submit an acceptable agreement to Pontus Net Lease that would give both the 6690 Property and the Headquarters Building reciprocal access to drives, parking, stormwater, and utility easements, signage, and maintenance ("REA"), and Pontus Net Lease promised to respond promptly if it objected to the proposed REA. (Sale-Leaseback Agreement § 1.07.)

64. Closing the Sale-Leaseback Agreement and the master lease was crucial to the iMedia Group because — as Pontus Net Lease and Pontus Capital knew — PNC required that the iMedia Group complete the sale-leaseback transaction with Pontus Net Lease before PNC would close the refinancing of the iMedia Group's debt with Siena. The iMedia Group was thus under immense pressure to close the Sale-Leaseback Agreement by January 31, 2023, when the January 31 Siena Forbearance Period was set to expire.

65. After signing the Sale-Leaseback Agreement, and fully understanding the liquidity pressure the iMedia Group faced, Pontus Net Lease executed a strategy to place iMedia Group under even more duress to extract far more value than Pontus Net Lease provided.

66.    Pontus Net Lease exploited the iMedia Group's desperate financial situation.

67.    Pontus Net Lease's strategy worked.  Not only did Pontus Net Lease hike the lease obligations (and thereby effectively slash the purchase price of the properties being sold), but Pontus Net Lease also maneuvered the iMedia Group into conveying the 6690 Property, worth at least $7 million dollars, to Pontus Net Lease for free.

68.    The Sale-Leaseback Agreement provided that Pontus Net Lease and iMedia Group would negotiate and enter a triple-net lease within a 40-day inspection period ("the Inspection Period").

69.    The Inspection Period ended before the January 31 Siena Forbearance Period and the same weekend as the end of the iMedia Group's fiscal year — January 29, 2023.

70.    Pontus Net Lease and the iMedia Group exchanged drafts of the master lease agreement provided for by the Sale-Leaseback Agreement throughout January 2023, and the iMedia Group responded promptly to any Pontus Net Lease concern.

71.    The iMedia Group provided Pontus Net Lease with a draft REA related to the subdivision of the 6690 Property on January 19, 2023, but Pontus Net Lease never responded to the draft REA, instead telling the iMedia Group they would "get to it" and then failing to do so.

72.    In a May 1, 2023 8-K filing with the United States Securities and Exchange Commission, the iMedia Group made the following public disclosures about its financial condition as of January 28, 2023:

> The Company anticipates that its statement of operations for the three-month period ended January 28, 2023, will reflect (1) a decrease in net sales to approximately $133.5 million,

compared with net sales of $193.8 million for the comparable prior year period, (2) a significant increase in the pre-tax net loss to approximately $62.7 million, compared with a pre-tax net loss of $5 million for the comparable prior year period, and (3) a significant increase in operating expenses to approximately $102.9 million, compared with operating expenses of $74.5 million for the comparable prior year period.

The Company anticipates that its statement of operations for the fiscal year ended January 28, 2023, will reflect (1) a decrease in net sales to approximately $544.5 million, compared to net sales of $551.1 for the prior fiscal year, (2) a significant increase in the pre-tax net loss to approximately $108.6 million, compared to a $22 million pre-tax net loss for the prior fiscal year, and (3) a significant increase in operating expenses to approximately $295.8 million, compared to operating expenses of $295.7 million for the prior fiscal year.

73.    In fact, by January 28, 2023, not only was iMedia Brands experiencing financial distress, both EP Properties and VVI were insolvent, in that their liabilities greatly exceeded their assets.

74.    With the January 31 Siena Forbearance Period about to expire, Pontus Net Lease seized on the iMedia Group's duress to revamp the deal to its benefit and to the iMedia Group's detriment.

75.    By the time Pontus Net Lease was done, the iMedia Group was forced to sell the 6690 Property valued at $7 million for no additional consideration.  Beyond that, Pontus Net Lease's draft master lease imposed on the iMedia Group far more onerous terms than provided for under the LOI and the original Sale-Leaseback Agreement.

76. Table 1 lists some of the key changes at the iMedia Group's expense.

**TABLE 1**

|  | Original | Final |
|---|---|---|
| **Annual Base Rent** | $4,320,00 | $4,536,000 |
| **Lease Term** | 21 years | 25 years |
| **Annual rent escalations** | 2.5% | 3.0% |
| **Security Deposit** | Six months' rent | One year's rent |

77. On January 30, 2023, Pontus Net Lease started to backtrack in its negotiation of the master lease agreement.

78. Pontus Net Lease's January 30, 2023, draft master lease agreement included triple-net lease provisions far outside the industry norm, such as (a) a provision that the lease tenant (one of iMedia's affiliates) could not cure a default until the landlord (Pontus Net Lease) gave written notice that the tenant had cured; and (b) landlord (Pontus Net Lease) would not be liable for damages (only injunctive relief for failing to give appropriate consent) but tenants would be liable for consequential damages for any defaults. Although the iMedia Group received nothing in exchange, it had no practical choice but to agree.

79. On January 30, 2023, Pontus Net Lease provided the iMedia Group with a conditional acceptance letter.

80. Pontus Net Lease asked to extend the Inspection Period for five business days to provide the parties with time to: (a) negotiate the lease; and (b) finalize outstanding actions relating to title.

81.    The same day, Pontus Net Lease called iMedia's CEO and stated the reason for the delay was to add two "small asks": (a) Pontus demanded a "right of first offer" with respect to the 6690 Property to ensure iMedia did not sell it at a discount that would reduce the value of the Headquarters Building; and (b) instead of a letter of credit for the six-month $2-million security deposit, Pontus demanded a cash deposit, further straining iMedia Group's cash availability.

82.    As Pontus Net Lease already knew, the iMedia Group had no choice but to agree to both.

83.    As a result of the delay caused by Pontus Net Lease's shifting demands, the iMedia Group also had no choice but to again amend its forbearance agreement with Siena to avoid a default.

84.    This Ninth Amendment to the ABL, dated February 1, 2023, came at considerable cost, as the iMedia Group had to commit to a $100,000 amendment fee, payable on the earlier of the closing of: (a) the Pontus Net Lease sale-leaseback closing or maturity date; or (b) February 28, 2023, the new forbearance-termination date.

85.    A true and correct copy of the Ninth Amendment to the ABL is attached hereto as **Exhibit 3** (the "Ninth Amendment").

86.    The Ninth Amendment further reduced the iMedia Group's borrowing base by $5 million (Exhibit 3 at § 4(b)(h)), and added a guaranty and liens on all equity of German subsidiaries (*id.* at § 4(e)).

87.    This left the iMedia Group even more desperate — without PNC replacing Siena as lender, the iMedia Group did not expect to be able pay its debts as they became due.

88. By February 4, 2023, the iMedia Group had largely finalized the terms under which PNC would refinance the Siena debt, but the refinancing remained conditional on closing the Pontus Net Lease sale-leaseback transaction.

89. The same day, the iMedia Group informed Pontus Net Lease that it agreed to the latter's latest draft of the master lease agreement and the iMedia Group considered it final.

90. The iMedia Group expected that Pontus Net Lease would immediately send a notice to close, beginning the countdown to close, up to 15 business days.

91. But Pontus Net Lease moved the goal posts yet again, seeking a call with the iMedia Group about a "title issue."

92. The "title issue" was pretext.

93. Alternatively, if and to the extent the "title issue" were not pretext, the iMedia Group offered to buy, at its own expense, insurance to address any perceived risk to Pontus Net Lease, but the latter delayed the closing and demanded even more, maneuvering to take the 6690 Property for no additional consideration by adding a provision to the draft master lease barring the iMedia Group from subdividing the 6690 Property for two years.

94. Pontus Net Lease further structured the transfer as a "two-year delay" of the subdivision, believing that if the iMedia Group filed for bankruptcy, Pontus Net Lease could evade fraudulent-transfer laws even though Pontus Net Lease provided nothing for the 6690 Property.

95. Section 548 of the Bankruptcy Code allows debtors to challenge any transfer made

within two years before filing if the debtor is insolvent and did not receive reasonably-equivalent value.

96.    To circumvent this statute, Pontus Net Lease inserted provisions in the draft master lease that would convey outright ownership of the 6690 Property to Pontus Net Lease, for no consideration, by terminating the iMedia Group's rights upon a bankruptcy filing.

97.    Pontus Net Lease sought to gain ownership of the 6690 Property simply because of the iMedia Group's failure to subdivide the property, which Pontus prohibited, and not as a result of a separate "transfer" of the Property that could and would be challenged.

98.    Pontus Net Lease then continued to take positions in the negotiation to ensure a prompt bankruptcy filing, so that it could take the 6690 Property for itself.

99.    On or about February 6, 2023, Pontus Net Lease issued another conditional notice to close, this time demanding additional time to finalize certain items of due diligence and making closing conditional upon: (a) receipt of an environmental assessment of the Headquarters Building in an acceptable form; (b) equity-level property-condition reports in an acceptable form; (c) finalization of title pro forma and a survey for the Kentucky Properties; (d) third-party reports addressed and certified with reliance letters; and (e) execution no later than five days before closing of a post-closing agreement under which the tenant-to-be would make financially-significant improvements to the real estate being conveyed.

100.    By February 8, 2023, Siena began to question Pontus Net Lease's delay tactics and

refused to fund any of the iMedia Group's requests unless and until Siena spoke with Pontus Net Lease to determine whether Pontus Net Lease was serious about closing the sale-leaseback transaction.

101.   On the call, Pontus Net Lease indicated that there were only a handful of issues left, mainly getting updated reports, the completion of which were already underway.

102.   In reality, Pontus Net Lease schemed to keep delaying the closing and force even more concessions from the iMedia Group.

103.   By February 14, 2023, final drafts of a PNC credit agreement to take out Siena were circulated, still conditional on the closing of the Pontus Net Lease transaction.

104.   Pontus Net Lease used the opportunity to wring even more concessions out of the iMedia Group, while providing nothing in return.

105.   Pontus Net Lease sent two successive notices to close on February 24, 2023, and again on February 28, 2023, the same day the forbearance period ended under the Ninth Amendment.

106.   In the notices, Pontus Net Lease demanded: (a) that the lease term increase to 22 years; (b) that the rent escalators increase to 3%; (c) that the iMedia Group refinance with PNC Bank concurrent with the Pontus Net Lease closing; and (d) that the iMedia Group provide evidence before closing of a right to redeem an amount equal to 50% of the current outstanding balance of a $19.9 million note with a third party in the period 12 months following closings.

107.   Pontus Net Lease's strategic delays caused PNC to abandon the transaction, putting the iMedia Group in an even more precarious position and vulnerable to Pontus Net

Lease's unreasonable demands.

108. In response to Pontus Net Lease's February 28, 2023 notice to close, PNC announced that Pontus Net Lease's delay required PNC to go back to its credit committee and again obtain approval of the refinancing.

109. From that point on, the sale-leaseback transaction kept getting worse for the iMedia Group.

110. On March 9, 2023, Pontus Net Lease sent a third amended conditional notice to close, this time: (a) increasing the base rent to $4,536,000; (b) increasing the lease term to 25 years; (c) requiring the iMedia Group to obtain a loan amendment from Siena no earlier than September 30, 2023, with at least one 90-day extension; (d) requiring the iMedia Group to complete a Private Investment in Public Equity (PIPE) of not less than $3,000,000 before closing; and (e) requiring the iMedia Group to provide, within three days before closing, evidence that it had redeemed at least 50% of an unrelated outstanding note, and paying that $19.99 million note in full within 12 months following closing.

111. On March 31, 2023, Siena sent the iMedia Group a notice of default and reservation of rights letter, with extensive defaults noticed.

112. Finally, Pontus Net Lease assigned all of its rights and obligations under the Sale-Leaseback Agreement to Defendant Pontus IMB, and on April 10, 2023, the sale-leaseback transaction closed and Pontus IMB entered into the Master Lease with iMedia Brands.

113. A true and correct copy of the Master Lease is attached hereto as **Exhibit 4**.

114. The Master Lease covered properties located at "6740 Shady Oak Lane, Eden Prairie, Minnesota," 4811 Nashville Road, Bowling Green, Kentucky, and 4813 Nashville Road, Bowling Green, Kentucky.

115. Eden Prairie, Minnesota, does not contain a street named "Shady Oak Lane." Instead, the street is named "Shady Oak Road."  It is this street that was intended to be referred to in the Master Lease.

116. The Master Lease's "primary term" or "Original Lease Term" ends on April 30, 2048.

117. Section 3.2 of the Master Lease provides that the "Tenant shall have the option to extend the term of this Lease for up to two (2) separate options periods of ten (10) years each upon and subject to the terms set forth in this Section 3.2."  (Underlining in original.)

118. On April 10, 2023, and in connection with the Master Lease, Pontus IMB, iMedia Brands, EP Properties, and VVI also entered into the post-closing letter agreement referenced in paragraph 99 above ("the Letter Agreement").

119. A true and correct copy of the Letter Agreement is attached hereto as **Exhibit 5**.

120. Under the Letter Agreement, Pontus IMB required the tenants of the properties sold and leased back to perform repairs to those properties totaling more than $958,500.

121. Pontus IMB also required EP Properties to deposit $886,800 into an escrow account to cover the repairs to the Headquarters Building, and required the deposit of an additional $98,700 into escrow, for a total escrow deposit of $985,500.

122. These requirements were not provided for by the LOI or Sale-Leaseback Agreement

and further reduced the liquidity of the iMedia Group.

123. Thus, by April 2023, Pontus Net Lease and Pontus IMB had extracted from the iMedia Group: (a) base rent of $4,536,000 per year, rather than the $4,320,000 set forth in the LOI and provided for by the Sale-Leaseback Agreement; (b) the 6690 building worth roughly $7,000,000 for no additional consideration or payment, instead of that property being retained by EP Properties; (c) a 25-year initial lease term, instead of the 21-year initial lease term set forth in the LOI and provided for by the Sale-Leaseback Agreement; (d) annual rent escalations of 3.0% annually, rather than 2.5% as set forth in the LOI and provided for in the Sale-Leaseback Agreement; (e) a security deposit of one year's rent, rather than the six-months' rent security deposit set forth in the LOI and provided for by the Sale-Leaseback Agreement; and (f) a property-repair requirement requiring the expenditure of more than $958,500, of which $985,500 was prefunded into escrow, to be reimbursed after the improvements were completed, straining cash flow.

124. Pontus IMB also insisted on a complex set of provisions locking in its receipt of the 6690 Property, while paying the iMedia Group nothing for it.

125. For example, Article 26 of the final Master Lease precluded the iMedia Group from subdividing the property before October 2023.

126. The Master Lease further provides that if the iMedia Group files for bankruptcy protection, then its right to subdivide and purchase the 6690 Property from Pontus IMB for $100 would terminate. (Master Lease § 26.1.)

127. Pontus IMB also would have the right to buy the 6690 Property for $100 after a

bankruptcy filing (*id.*), further evidencing that Pontus IMB never intended to provide reasonable value for the 6690 Property.

128. On June 28, 2023 — less than three months after the iMedia Group closed the sale-leaseback with Pontus IMB and conveyed four buildings to Pontus IMB for limited short-term liquidity — the iMedia Group filed a Chapter 11 bankruptcy petition in the Bankruptcy Court.

129. On August 10, 2023, the iMedia Group held an auction in which IV Media was selected as the winning bidder, after which the iMedia Group entered into an Asset and Equity Purchase Agreement ("the AEPA") with IV Media.

130. A true and correct copy of the AEPA is attached hereto as **Exhibit 6**.

131. The Bankruptcy Court approved the AEPA on August 15, 2023, in a Sale Order (ECF 461).

132. On January 24, 2024, counsel for the Bankruptcy debtors (which included iMedia Brands), filed a notice of designation of assumption and assignment of the Master Lease (ECF 923), in which the debtors provided notice of their intent to assume and assign the Master Lease to "Buyer designee" IV Properties.

133. The Bankruptcy Court accepted IV Properties' substitution as "Buyer designee" with respect to the Master Lease and related agreements in a February 12, 2024 Order (ECF 964 at 2).

134. The Court's Order directed that:

> Effective upon payment of [$40,534.03], the Pontus Master Lease Agreement shall be deemed assumed by the Debtors and assigned to Buyer designee IV Media Properties LLC in

accordance with the terms of the Sale Order, as further set forth herein. Thereafter, (a) the Pontus Master Lease Agreement shall be a Purchased Contract under the Asset and Equity Purchase Agreement approved by the Sale Order, (b) the Pontus Objection shall be deemed withdrawn, and (c) the Pontus Administrative Claim shall be deemed satisfied and withdrawn.

(ECF 964 at 2 & 964-1.)

135. IV Properties duly paid Pontus the sum of $40,534.03, whereafter it became the Tenant (as that term is defined in the Master Lease) under the Master Lease.

136. Section 14.3 of the Master Lease provides, in relevant part, that "Tenant shall have the right to sublet any portion of the Property at any time without Pontus' consent (a) to any sublessee that is owned by or under common control of Tenant."

137. Pursuant to section 14.3 of the Master Lease and as permitted under section 14.3, IV Properties granted a non-exclusive license effective as of February 12, 2024, to Plaintiff IV Media — an affiliate of IV Properties and under common control with IV Properties — to occupy and use the leased premises.

## CAUSES OF ACTION

### COUNT I
### AVOIDANCE AND RECOVERY OF FRAUDULENT
### TRANSFERS/OBLIGATIONS
### 11 U.S.C. §§ 548(a)(1)(B), 550(a)
### (AGAINST PONTUS IMB PORTFOLIO, LLC AND
### PONTUS NET LEASE ADVISORS, LLC)

138. Plaintiffs incorporate paragraphs 1 through 137 as if fully set forth herein.

139. EP Properties, VVI, and iMedia Brands entered into the Sale-Leaseback Agreement and Letter Agreement, transferred the Kentucky Properties and Minnesota Properties to

Pontus IMB, and deposited $985,500 into escrow for the benefit of Pontus IMB, but did not receive reasonably equivalent value in exchange, with no consideration being provided for the Headquarters Building, and the reduction in value affecting not only EP Properties, but also, indirectly, iMedia Brands and VVI.

140.  Pontus IMB and Pontus Net Lease received the 6690 Property — valued at about $7 million — for free.

141.  When EP Properties, VVI, and iMedia Brands entered into the Sale-Leaseback Agreement and the Letter Agreement, transferred the Kentucky Properties and the Minnesota Properties to Pontus IMB, and deposited $985,500 into escrow, they (a) were insolvent on the date that the transfer was made and the obligations were incurred, or became insolvent as a result of such transfers and/or obligations; (b) were engaged in business or a transaction, or were about to engage in business or a transaction, for which any property remaining with EP Properties, VVI, and iMedia Brands was an unreasonably small capital; and/or (c) intended to incur, or believed that EP Properties, VVI, and iMedia Brands would incur, debts that would be beyond their ability to pay as such debts matured.

142.  Based on the foregoing, all of EP Properties', VVI's, and iMedia Brands' obligations under the Sale-Leaseback Agreement and the Letter Agreement relating to the Minnesota Properties and Kentucky Properties, the transfers of the Minnesota Properties and Kentucky Properties to Pontus IMB and Pontus Net Lease, and the transfer of $985,500 into escrow for the benefit of Pontus IMB and Pontus Net Lease may be avoided as fraudulent transfers/obligations under 11 U.S.C. § 548(a)(1)(B).

143.    Because IV Media and IV Properties stand in the shoes of the Bankruptcy Trustee, having purchased all "avoidance claims or causes of action arising under sections 544, 547, 548, 549 and 550 of the Bankruptcy Code and any similar state Law," among other causes of action, (AEPA § 2.01(n)), IV Media and IV Properties here seek and are entitled to entry of an order and judgment avoiding as fraudulent transfers/obligations under 11 U.S.C. §§ 548(a)(1)(B) and 550(a) all of EP Properties', VVI's, iMedia Brands', IV Media's, and IV Properties' obligations under the Sale-Leaseback Agreement and the Letter Agreement relating to the Minnesota Properties and the Kentucky Properties, the transfers of the Minnesota Properties and the Kentucky Properties to Pontus IMB, and the transfer of $985,500 into escrow for the benefit of Pontus IMB, and awarding IV Media and IV Properties a judgment against Pontus IMB and Pontus Net Lease awarding IV Media and IV Properties all real estate and personal property conveyed in the Sale-Leaseback Agreement or, in the alternative, a monetary judgment for the value of the Minnesota Properties and the Kentucky Properties, and a monetary judgment for the $985,500 escrow payment.

## COUNT II
## AVOIDANCE AND RECOVERY OF FRAUDULENT TRANSFERS/OBLIGATIONS
## 11 U.S.C. §§ 548(a)(1)(B), 550(a)
## (AGAINST PONTUS IMB PORTFOLIO, LLC)

144.    Plaintiffs incorporate paragraphs 1 through 143 as if fully set forth herein.

145.    Under the Master Lease, Pontus IMB purported to lease the Kentucky Properties and the Minnesota Properties to iMedia Brands and purports to now lease the

Kentucky Properties and the Minnesota Properties to IV Properties. Additionally, under the Letter Agreement, iMedia Brands was required to make certain repairs to the Kentucky Properties and the Minnesota Headquarters, which obligation was assumed by IV Properties. But under Count I, Pontus IMB's ownership interest in the Kentucky Properties and the Minnesota Properties is voidable and will be voided. Therefore, Pontus IMB had and has (a) no right to lease the Kentucky Properties and the Minnesota Properties to iMedia Brands or IV Properties and (b) no right to obligate iMedia Brands or IV Properties to make repairs to the Kentucky Properties and the Minnesota Headquarters.

146.    iMedia Brands entered into the Master Lease and the Letter Agreement with Pontus IMB and did not receive reasonably equivalent value in exchange. Under the Master Lease and the Letter Agreement, iMedia Brands and IV Properties must pay rent to Pontus IMB for the Kentucky Properties and the Minnesota Properties, and perform other obligations relating to the Kentucky Properties and the Minnesota Properties, even though under Count I Pontus IMB does not own or have any interest in the Kentucky Properties and the Minnesota Properties.

147.    When EP Properties, VVI, and iMedia Brands entered into the Master Lease and the Letter Agreement with Pontus IMB, EP Properties, VVI, and iMedia Brands (a) were insolvent on the date that such transfer was made or such obligation was incurred, or became insolvent as a result of such transfer or obligation; (b) were engaged in business or a transaction, or were about to engage in business or a transaction, for which any property remaining with EP Properties, VVI, and iMedia

Brands was an unreasonably small capital; and/or (c) intended to incur, or believed that EP Properties, VVI, and iMedia Brands would incur, debts that would be beyond their ability to pay as such debts matured.

148. Based on the foregoing, all of EP Properties', VVI's, and iMedia Brands' obligations under the Master Lease and the Letter Agreement relating to the Kentucky Properties and the Minnesota Properties, including, without limitation, rent, security deposits, maintenance and repair obligations, and the $985,500 escrow payment, may be avoided as fraudulent transfers/obligations under 11 U.S.C. § 548(a)(1)(B).

149. Because IV Media and IV Properties stand in the shoes of the Liquidating Trustee, having purchased all "avoidance claims or causes of action arising under sections 544, 547, 548, 549 and 550 of the Bankruptcy Code and any similar state Law," among other causes of action, (AEPA § 2.01(n)), IV Media and IV Properties here seek and are entitled to entry of an order and judgment avoiding as fraudulent transfers/obligations under 11 U.S.C. § 548(a)(1)(B) and 550(a) all of EP Properties', VVI's, iMedia Brands', IV Media's, and IV Properties' obligations under the Master Lease and the Letter Agreement relating to the Kentucky Properties and the Minnesota Properties, including, without limitation, rent, security deposits, maintenance and repair obligations, and the $985,500 escrow payment, and awarding IV Media and IV Properties a monetary judgment against Pontus IMB for the amount of all rent and security deposits paid, all maintenance and repair obligations incurred that do not accrue to permanent value of the Kentucky

Properties and the Minnesota Properties, and the $985,500 escrow payment.

### COUNT III
### UNIFORM VOIDABLE TRANSACTIONS ACT
### MINN. STAT. §§ 513.44(a)(2), 513.45(a), AND 11 U.S.C. § 544
### (AGAINST PONTUS IMB PORTFOLIO, LLC AND
### PONTUS NET LEASE ADVISORS, LLC)

150.   Plaintiffs incorporate paragraphs 1 through 137 as if fully set forth herein.

151.   Many pre-petition creditors had state law Voidable-Transfer Act claims against the Defendants.

152.   When the Bankruptcy was filed, the Bankruptcy Trustee acquired all state law Uniform Voidable-Transfer Act claims and through the Bankruptcy sale assigned those rights to IV Media, which now may assert state law Uniform Voidable Transactions Act claims against the Defendants.

153.   EP Properties, VVI, and iMedia Brands entered into the Sale-Leaseback Agreement and Letter Agreement, transferred the Kentucky Properties and Minnesota Properties to Pontus IMB, and deposited $985,500 into escrow for the benefit of Pontus IMB, but did not receive reasonably equivalent value in exchange, with no consideration being provided for the Minnesota Headquarters, and the reduction in value affecting not only EP Properties, but also, indirectly, iMedia Brands and VVI.

154.   Pontus IMB and Pontus Net Lease received the 6690 Property — valued at about $7 million — for free.

155.   When EP Properties, VVI, and iMedia Brands entered into the Sale-Leaseback Agreement and the Letter Agreement, transferred the Kentucky Properties and the Minnesota Properties to Pontus IMB, and deposited $985,500 into escrow, they (a)

were engaged or were about to engage in a business or a transaction for which the remaining assets of the debtors were unreasonably small in relation to the business or transaction; or (b) intended to incur, or believed or reasonably should have believed that the debtors would incur, debts beyond the debtors' ability to pay as they became due.

156. Based on the foregoing, all of EP Properties', VVI's, and iMedia Brands' obligations under the Sale-Leaseback Agreement and the Letter Agreement relating to the Minnesota Properties and Kentucky Properties, the transfers of the Minnesota Properties and Kentucky Properties to Pontus IMB and Pontus Net Lease, and the transfer of $985,500 into escrow for the benefit of Pontus IMB and Pontus Net Lease may be avoided under Minn. Stat. §§ 513.44(a)(2), 513.45(a), and 11 U.S.C. § 544.

157. Because IV Media and IV Properties stand in the shoes of the Liquidating Trustee, having purchased all "avoidance claims or causes of action arising under sections 544, 547, 548, 549 and 550 of the Bankruptcy Code and any similar state Law," among other causes of action, (AEPA § 2.01(n)), IV Media and IV Properties here seek and are entitled to entry of an order and judgment avoiding under Minn. Stat. §§ 513.44(a)(2), 513.45(a), and 11 U.S.C. § 544 all of EP Properties', VVI's, iMedia Brands', IV Media's, and IV Properties' obligations under the Sale-Leaseback Agreement and the Letter Agreement relating to the Minnesota Properties and Kentucky Properties, the transfers of the Minnesota Properties and Kentucky Properties to Pontus IMB, and the transfer of $985,500 into escrow for the benefit of Pontus IMB, and awarding IV Media and IV Properties a judgment

against Pontus IMB and Pontus Net Lease awarding IV Media and IV Properties all real estate and personal property conveyed in the Sale-Leaseback Agreement or, in the alternative, a monetary judgment for the value of the Minnesota Properties and the Kentucky Properties, and a monetary judgment for the $985,500 escrow payment.

### COUNT IV
### UNIFORM VOIDABLE TRANSACTIONS ACT
### MINN. STAT. §§ 513.44(a)(2), 513.45(a), AND 11 U.S.C. § 544
### (<u>AGAINST PONTUS IMB PORTFOLIO, LLC</u>)

158.    Plaintiffs incorporate paragraphs 1 through 137 and paragraphs 151 through 157 as if fully set forth herein.

159.    Under the Master Lease, Pontus IMB purported to lease the Kentucky Properties and the Minnesota Properties to iMedia Brands and purports to now lease the Kentucky Properties and the Minnesota Properties to IV Properties.  Additionally, under the Letter Agreement, iMedia Brands was required to make certain repairs to the Kentucky Properties and the Minnesota Headquarters, which obligation was assumed by IV Properties.  But under Count III, Pontus IMB's ownership interest in the Kentucky Properties and the Minnesota Properties is voidable and will be voided.  Therefore, Pontus IMB had and has (a) no right to lease the Kentucky Properties and the Minnesota Properties to iMedia Brands or IV Properties and (b) no right to obligate iMedia Brands or IV Properties to make repairs to the Kentucky Properties and the Minnesota Headquarters.

160.    iMedia Brands entered into the Master Lease and the Letter Agreement with Pontus

IMB and did not receive reasonably equivalent value in exchange. Under the Master Lease and the Letter Agreement, iMedia Brands and IV Properties must pay rent to Pontus IMB for the Kentucky Properties and the Minnesota Properties, and perform other obligations relating to the Kentucky Properties and the Minnesota Properties, even though under Count III Pontus IMB does not own or have any interest in the Kentucky Properties and the Minnesota Properties.

161. When EP Properties, VVI, and iMedia Brands entered into the Master Lease and the Letter Agreement with Pontus IMB, EP Properties, VVI, and iMedia Brands, they (a) were engaged or were about to engage in a business or a transaction for which the remaining assets of the debtors were unreasonably small in relation to the business or transaction; or (b) intended to incur, or believed or reasonably should have believed that the debtors would incur, debts beyond the debtors' ability to pay as they became due.

162. Based on the foregoing, all of EP Properties, VVI, and iMedia Brands' obligations under the Master Lease and the Letter Agreement relating to the Kentucky Properties and the Minnesota Properties, including, without limitation, rent, security deposits, maintenance and repair obligations, and the $985,500 escrow payment, may be avoided under Minn. Stat. § 513.44(a)(2) and 11 U.S.C. § 544.

163. Because IV Media and IV Properties stand in the shoes of the Liquidating Trustee, having purchased all "avoidance claims or causes of action arising under sections 544, 547, 548, 549 and 550 of the Bankruptcy Code and any similar state Law," among other causes of action, (AEPA § 2.01(n)), IV Media and IV Properties here

seek and are entitled to entry of an order and judgment avoiding under Minn. Stat. §§ 513.44(a)(2), 513.45(a), and 11 U.S.C. § 544 all of EP Properties', VVI's, iMedia Brands', IV Media's, and IV Properties' obligations under the Master Lease and the Letter Agreement relating to the Kentucky Properties and the Minnesota Properties, including, without limitation, rent, security deposits, maintenance and repair obligations, and the $985,500 escrow payment, and awarding IV Media and IV Properties a monetary judgment against Pontus IMB for the amount of all rent and security deposits paid, all maintenance and repair obligations incurred that do not accrue to permanent value of the Kentucky Properties and the Minnesota Properties, and the $985,500 escrow payment.

### COUNT V
### *PLEADED IN THE ALTERNATIVE*
### DECLARATORY JUDGMENT 28 U.S.C. § 2201(a)
### (AGAINST PONTUS IMB PORTFOLIO, LLC)

164.    Plaintiff incorporates paragraphs 1 through 137 as if fully set forth herein.

165.    Count V is pleaded in the alternative to Counts I through IV.

166.    Article 26 of the Master Lease terminated the iMedia Group's right to subdivide the 6690 Property solely as a result of its bankruptcy filing. This provision is unenforceable under 11 U.S.C. § 365(e)(1)(B).

167.    A justiciable controversy exists between the parties as to the enforceability of this provision in Article 26 of the Master Lease.

168.    28 U.S.C. § 2201(a) grants this Court the power to declare the rights and other legal relations of any interested party seeking such declaration, whether or not further

relief is or could be sought.

169. Any such declaration shall have the force and effect of a final judgment or decree and shall be reviewable as such.

170. IV Media and IV Properties seek, and are entitled to, a declaratory judgment under 28 U.S.C. § 2201(a) that the provision in Article 26 of the Master Lease terminating the iMedia Group's right to subdivide the 6690 Property solely as a result of its bankruptcy filing is unenforceable under 11 U.S.C. § 365(e)(1)(B).

171. As a result, IV Media and IV Properties seek, and are entitled to, a declaratory judgment under 28 U.S.C. § 2201(a) that they — as successors-in-interest to the iMedia Group's rights under the Master Lease — have the right to subdivide the 6700 Shady Oak Road, Eden Prairie, Minnesota, lot to separate the 6690 Property and its land from the Headquarters Building and its land, as otherwise provided for in Article 26 of the Master Lease.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiffs pray for relief as follows:

1. Entry of a judgment voiding the Sale-Leaseback Agreement;

2. Entry of a judgment restoring title to the real estate and personal property at issue in the Sale-Leaseback Agreement, substituting Plaintiff IV Media, LLC for EP Properties and VVI Fulfillment Center pursuant to the Bankruptcy Court's orders, and thus awarding title solely to Plaintiff IV Media, LLC or, in the alternative, awarding Plaintiff IV Media a monetary judgment for the value thereof;

3.      Entry of a judgment voiding the Master Lease;

4.      Entry of a judgment awarding Plaintiff IV Properties — as successor-in-interest to iMedia Brands pursuant to the Bankruptcy Court's orders — a judgment against Pontus IMB for the amount of all rent and security deposits paid and all maintenance and repair obligations incurred that do not accrue to permanent value of the Kentucky Properties and the Minnesota Properties, made from April 10, 2023, through the date of judgment;

5.      Entry of a judgment voiding the iMedia Post-Closing Obligations Agreement dated April 10, 2023, between Pontus IMB and EP Properties, VVI, and iMedia Brands;

6.      Entry of a monetary judgment in favor of Plaintiff IV Media — as successor-in-interest to EP Properties and VVI pursuant to the Bankruptcy Court's orders — and in favor of Plaintiff IV Properties — as successor-in-interest to iMedia Brands pursuant to the Bankruptcy Court's orders — against Pontus IMB for the principal amount of escrowed "Repair Costs reserve" funds of $958,500, plus interest.

7.      In the alternative, entering a declaratory judgment under 28 U.S.C. § 2201(a) that the provision in Article 26 of the Master Lease terminating the iMedia Group's right to subdivide the 6690 Property solely as a result of its bankruptcy filing is unenforceable under 11 U.S.C. § 365(e)(1)(B) and that IV Media and IV Properties — as successors-in-interest to the iMedia Group's rights under the Master Lease — have the right to subdivide the 6700 Shady Oak Road, Eden Prairie, Minnesota, lot to separate the 6690 Property and its land from the Headquarters Building and its land, as otherwise provided for in Article 26 of the Master Lease.

8.   Awarding Plaintiffs such additional and further relief as the Court may deem just and equitable, including pre- and post-judgment interest.

## JURY TRIAL DEMAND

Plaintiffs demand a trial by jury of all issues so triable.

*Signature block on next page*

**STOEL RIVES LLP**

DATED:  April 10, 2025

*s/ Marc A. Al*
Marc A. Al  (247923)
33 South Sixth Street, Suite 4200
Minneapolis, MN  55402
Telephone: (612) 373-8801
Facsimile:  (612) 373-8881
marc.al@stoel.com

Bryan T. Glover
   (Washington State Bar No. 51045)
   (*pro hac vice* petition to be submitted)
600 University Street, Suite 3600
Seattle, WA  98101
bryan.glover@stoel.com

**COUNSEL FOR PLAINTIFFS**
**IV MEDIA, LLC, AND**
**IV MEDIA PROPERTIES, LLC**